A. Clifford Edwards
A. Christopher Edwards
John Edwards
EDWARDS & CULVER
1648 Poly Drive, Suite 206
Billings, Montana 59102
Phone: (406) 256-8155
Facsimile: (406) 256-8159
nicole.carson@edwardslawfirm.org
chris@edwardslawfirm.org
john.edwards@edwardslawfirm.org

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| RALPH HUTT,<br><br>        Plaintiff,<br><br>v.<br><br>ZURICH AMERICAN INSURANCE COMPANY,<br><br>        Defendant. | Cause No. _____<br><br><br>**COMPLAINT** |

## <u>Jurisdiction</u>

1.     This action seeks equitable relief of disgorgement of profits earned through use of insurance liability as a market commodity and damages for violations of insurance claim handling duties.

2.     Defendant Zurich American Insurance Company (herein "Zurich") is a New York corporation with its principal place of business in Illinois.

3.     Plaintiff Ralph Hutt is a citizen and resident of Oregon. The claim settlement conduct alleged herein occurred in Montana with respect to claims in Montana State District Court civil action in Cascade County.

4.     This Court has jurisdiction of this case pursuant to 28 U.S.C. §1332 because there is both minimal and complete diversity of citizenship, and because the amount in controversy on the claims in this action exceeds the sum or value of $75,000, exclusive of interest and costs.

## Introduction

5.     For many years, insurer Zurich has breached its Claim Settlement Duties to Plaintiff Hutt, a claimant with a Clear Liability Claim. This case alleges that Zurich has calculatingly breached its Claim Settlement Duties to Plaintiff Hutt to implement a strategy of Opportunistic Breach, meaning that, because the (time-value) profit Zurich makes on withheld settlement payments to Hutt and other Libby Asbestos Claimants exceeds what it will pay on these insurance claims, it is profitable for Zurich to breach its Claim Settlement Duties and thereby increase the time over which it can generate income on money owed to them.

6.     To achieve justice for this Opportunistic Breach, it is not sufficient to compensate Plaintiff Hutt for the personal injury, emotional distress, fear and outrage because Zurich's profit through Opportunistic Breach exceeds the amount of a compensatory damages remedy. Without an order in equity of disgorgement,

Zurich's Opportunistic Breach will continue to yield a profitable outcome (i.e. regardless of the amount of tort judgments) and Zurich will continue to be financially incented to breach its Claim Settlement Duties.

7.     In addition to the claims (Claim 2, Claim 3, and Claim 4 below) for breach of the Claim Settlement Duties owed to Plaintiff Hutt, this Complaint pleads (in Claim 1) the factual basis for a judgment that Zurich deliberately interfered with Hutt's rights as an insurance claimant, utilized coercive leveraging, and strategically breached its Claim Settlement Duties owed to Hutt to secure and sustain the profits made on moneys that it would ultimately have to pay to Hutt and similarly situated Libby Asbestos Claimants.  Specifically, Zurich used Leveraging designed (a) to exploit Ralph Hutt's vulnerable position through withheld medical expense and low ball offers, (b) to favorably position Zurich to buy off Hutt's bellwether/lead claim before it established Zurich's claim preclusion liability to other Libby Asbestos Claimants, (c) to eliminate accountability for its strategy of profits through Opportunistic Breach by requiring Hutt to release his bad faith claim, and (d) to use the claim settlement treatment of Hutt's bellwether/lead case to influence the settlement value of cases following Hutt's lead case, enabling Zurich to buy off other Libby Asbestos Claimants' claims and thus continue Zurich's Commodity Profit scheme.

8.      Claim 1 seeks the court's exercise of its equitable jurisdiction to order disgorgement of the profit Zurich has made through its Opportunistic Breach scheme, including earnings on the money that Hutt and similarly situated Libby Asbestos Claimants need for basic health need such as supplemental oxygen - a system that undermines the protective purpose of insurance to create an enterprise of Commodity Profit that is a direct function delaying and extending human suffering.

## Meaning of Phrases Used in this Complaint

9.      As used in this Complaint the following phrases have these meanings

A.      "Opportunistic Breach" means the violation of clear legal duties with a strategic purpose and effect of generating profit.

B.      "Commodity Profit" means earnings on a marketable source of investment capital.

C.      "Claim Settlement Duties" means the statutory and common law duties an insurer owes to attempt good faith settlement of insurance claims with reasonably clear liability, including the duties to advance medical expenses, to conduct a reasonable investigation of facts and data supporting such claims, to attempt good faith settlement of claims based on facts derived through

such investigation, and to exert no leveraging in the claim settlement process.

D.    "Clear Liability Claims" means insurance claims in which the liability of MCC is "reasonably clear" within the meaning of Section 33-18-201, MCA.

E.    "Leveraging" means violating Claim Settlement Duties with an objective or effect to exploit insurance claimants' vulnerable position, to coerce settlements that are ill-advised for the claimant and strategically advantageous to the insurer, and/or to avoid accountability for (and preserve profitability of) Opportunistic Breach of Claim Settlement Duties.

F.    "Lead Case Strategy" means use of a litigation bottleneck and lead case procedures (with Plaintiff Hutt's being the lead and bellwether case) as an opportunity for an insurer to create and exert superior bargaining power, employ Leveraging, and Opportunistically Breach claim settlement duties so that the insurer can derive Commodity Profit on the claim reserves while the body of litigation is drawn out.

G.    "Time-value Enhanced" refers to a characteristic of a source of investment capital when there is little time-value cost of the

investment capital (e.g. nonrecovery of interest on insurance claimants' prejudgment general damages compared to market interest rates on a loan).

H.    "Sticky" refers to a characteristic of a source of investment capital when repayment of the underlying obligation is dependably controlled (e.g. because payment on asbestos claims only occurs slowly through a litigation bottleneck).

I.    "Libby Asbestos Claimants" means insurance claimants who were employed at W.R. Grace's mine and mill near Libby Montana and who have presented claims in Montana state or federal courts against MCC for asbestos disease injury arising from exposure to asbestos.

J.    "Supreme Court Ruling" means *Md. Cas. Co. v. Asbestos Claims Court*, 2020 MT 70, 399 Mont. 279, 460 P.3d 882.

K.    "MCC" means Maryland Casualty Company

L.    "Zurich" means Zurich American Insurance Company, successor by merger to MCC.

## Allegations Common to All Causes of Action

10.    On October 21, 2014, Plaintiff Hutt presented a claim that MCC is liable for his asbestos-related disease injuries from exposure to a hidden asbestos hazard at the W.R. Grace mine and mill near Libby, Montana.

11.    Zurich insured the claim against MCC. The liability of MCC for Plaintiff's claim always was and is reasonably clear as demonstrated by the facts (in MCC's own words and own MCC documents - the exclusive evidence of MCC's knowledge and conduct), the court's summary judgment ruling, and appellate rulings, the Order Reviewing and Affirming Punitive Damages Award, and the jury verdict and judgment.

12.    On January 13, 2019, the Asbestos Claims Court issued a summary judgment ruling that MCC owed Hutt and other workers a duty to warn of the hidden asbestos hazard at the W.R. Grace mill.

13.    On March 25, 2020, the Montana Supreme Court issued a ruling concluding that:

> MCC owed Hutt and other Grace workers a direct common law duty under Restatement (Second) of Torts § 324A(b)-(c) to use reasonable care under the circumstances to warn them of the known risk of exposure to airborne asbestos in the Grace workplace(s).
> …
> [I]t is undisputed that MCC made no independent effort to warn Grace workers of the asbestos dust hazard in and about Grace's Libby area facilities and operations.

Supreme Court Ruling at pars. 57, 17.

14.    The Supreme Court Ruling is based on undisputed facts that had been known to Zurich for decades, including when Plaintiff Hutt's claim was presented in 2016. The liability evidence of MCC's knowledge and conduct were established by MCC's own words, own documents and MCC's own corporate witness admissions.

15.    On February 17, 2022, a jury found that MCC had acted with malice when breaching its warning duty. The verdict is consistent with the opinion of Justice Gustafson, concurred in by Justices Shea and McKinnon and separately joined by Chief Justice McGrath (a combined majority of the Court):

> MCC was not merely negligent in its failure to act; rather, in strategically recognizing the latency period for asbestosis to develop, MCC engaged in affirmative actions to conceal the asbestos exposure risk and worker injuries to avoid liability, effectively increasing the risk of additional harm to Mill workers from further asbestos exposure.

Supreme Court Ruling at par. 80.

16.    Despite repeated requests for advance payment of medical care expenses of Plaintiff for his asbestos-related diseases, Zurich made no payments or offers of advance payment of medical expenses before March 9, 2022.

17.    Despite repeated requests for reasonable settlement of Plaintiff's claim, Zurich made no offer of settlement for years and until a trial date was imminent, made no reasonable offer to the Plaintiff before trial, and made no

offer to settle the verdict amount at any time to and through its receipt of the Order Reviewing and Affirming Punitive Damages Award and the final judgment.

18.     At all times from the October 21, 2014, presentation of Hutt's claim through December 13, 2022, Zurich failed:

> a.     to make timely or reasonable settlement offers or settlement contribution offers;
>
> b.     to make reasonable attempts to negotiate a fair settlement of Plaintiff's insurance claim;
>
> c.     to make any settlement, payment or advance payment of any medical care expense before March 9, 2022;
>
> d.     to make any settlement offer not conditioned on Plaintiff Hutt's release of his claim settlement handling claims against Zurich.

19.     These actions and failures of Zurich occurred and continue while Plaintiff has suffered and continues to suffer uncompensated losses for his injuries and the resulting economic burdens and health care needs resulting from such injuries and impairment of end-of-life decisions.

20.     Because of the failures of Zurich to make a reasonable settlement or make advance payments, Plaintiff has been and continues to be subject to unfair

exploitation of his position of disadvantage including his economic and health care related difficulties arising from his injuries.

21.    Because Plaintiff Hutt's case against MCC was the lead and bellwether case that the Asbestos Claim Court required to be resolved before more than 100 other Libby Asbestos Claimants' cases against MCC could proceed, Zurich used the opportunity of Hutt's case to implement a Lead Case Strategy of delaying resolution of the Hutt insurance claim and Opportunistically Breaching the Claim Settlement Duties Zurich owed to Hutt.

22.    Zurich knew and knows the exploitation effect suffered by Plaintiff, and it acted and continues to act (a) with an intent to take advantage of each Plaintiff's disadvantaged position during the settlement negotiations, (b) with intent and knowledge of the Leveraging effect of its conduct, (c) in conscious disregard of the known and intended injury to and Leveraging of Plaintiff and other Libby Asbestos Claimants, (d) with intent that the exploitation effect would decrease and delay its liability exposure with respect to the Hutt claim and the claims of similarly situated Libby Asbestos Claimants, (e) with intent to favorably position Zurich to buy off Hutt's claim before it established Zurich's claim preclusion liability to other Libby Asbestos Claimants; (f) with intent to eliminate accountability for its bad faith conduct by requiring Hutt to release his bad faith claim in order to secure a settlement of his insurance claim, and (g) with intent to use the claim settlement treatment of

Hutt's lead case to influence the settlement value of cases following Hutt's lead case, enabling Zurich to buy off other Libby Asbestos Claimants' claims and thus continue Zurich's Commodity Profit scheme.

23.    Zurich has calculated, at the expense of Plaintiff Hutt, to pursue the advantage of the earnings it makes on the delayed claim payments (a) to Hutt and (b) to similarly situated claimants by reason of the delay and claim handling conduct on the Hutt claim.

24.    Zurich has pursued and continues to pursue a claim delay strategy through    Opportunistic Breach of its Claim Settlement Duties because its Commodity Profit earnings outpace the exposure it projects for its claim liability and its liability for claim handling conduct.

## CLAIM 1
### (Claim for Equitable and Disgorgement Relief)

25.    All preceding allegations are hereby incorporated in this claim.

26.    Zurich is both an insurer and a self-insurer with respect to the personal injury claims against MCC by Plaintiff Hutt and similarly situated Libby Asbestos Claimants. Zurich owed Plaintiff the duties in Section 33-18-201, MCA, subsections (1), (4), (6) and (13) – including the duties to make advance payments, and the duty attempt good faith settlement, and further owed the common law duties of good faith dealings with third party insurance claimants.

27.    As described in Claims 2, 3, and 4 below, Zurich breached the statutory and common law good faith, advance payment and settlement duties it owed to Plaintiff Hutt.

28.    Zurich's breach of the statutory and common law good faith, advance payment and settlement duties it owed to Plaintiff Hutt is an Opportunistic Breach calculated to take advantage of Commodity Profit generated on money owed to Plaintiff Hutt and similarly situated Libby Asbestos Claimants on their insurance claims.

29.    Zurich's Opportunistic Breach is facilitated by a Lead Case Strategy for handling Hutt's insurance claim.

30.    Zurich deliberately breached its Claim Settlement Duties to Hutt upon Zurich's recognition that (a) a failure to timely settle  the claim in Hutt's lead case would delay the need to pay settlement amounts to other Libby Asbestos Claimants, (b) a failure to timely settle Hutt's lead case and withholding of advance medical bill payment would influence the settlement value of cases following Hutt's lead case, enabling Zurich to buy off other Libby Asbestos Claimants' claims, (c) a failure to timely settle Hutt's lead case would favorably position Zurich to buy off Hutt's claim before it established Zurich's claim preclusion liability to other Libby Asbestos Claimants, and (d) requiring Hutt to release his bad faith claim in order to secure a settlement of his insurance claim would eliminate accountability for Zurich's bad

faith conduct. In so acting, Zurich is a conscious wrongdoer unjustly enriched through misconduct, coercive Leveraging Opportunistic Breach and interference with Hutt's legally protected rights.

31.    The Commodity Profit generated by Zurich on money owed to Hutt and similarly situated Libby Asbestos Claimants is an inequitable unjust enrichment because it generates profits through Opportunistic Breach of clear Claim Settlement Duties owed to Plaintiff Hutt.

32.    The Commodity Profit generated by Zurich on money owed to Hutt and similarly situated Libby Asbestos Claimants is an inequitable unjust enrichment for the further reason that generating such profit through breach of insurance duties turns insurance claims and insurance reserves for fully accrued claims into a marketable commodity and source of speculative risk investment at the expense of the protection function of insurance, effectively destroying the legal and public policy basis for liability insurance and generating profit as a function of human suffering.

33.    The Commodity Profit generated by Zurich on money owed to Hutt and similarly situated Libby Asbestos Claimants is an inequitable unjust enrichment for the further reason that Zurich is a conscious wrongdoer: the profit is generated on investment capital that is available to Zurich precisely because Zurich is knowingly breaching its Claim Settlement Duties.

34.    The Commodity Profit generated by Zurich on money owed to Hutt and similarly situated Libby Asbestos Claimants is an inequitable unjust enrichment for the further reason that (a) an established multi-billion dollar market exists for purchase and sale of accrued asbestos claim liability to investors (including private equity investors), (b) Zurich is using and engaged in that market and thereby treating insurance reserves as a commodity (Zurich has brokered its accrued asbestos liability in the "retroactive reinsurance" market including a "sale" of $ .5 billion of such liability reserves to Enstar), (c) that market depends on Time-value Enhanced and Sticky characteristics of asbestos claim reserves, and (d) Zurich enhances the time-value component by exploiting the opportunity to delay claim resolution, and it enhances the stickiness component by exploiting the litigation bottleneck through a Lead Case Strategy.

35.    Specifically, Zurich has exploited the Time-value Enhanced route to Commodity Profit by deliberately breaching its duty to make "prompt" good faith settlement offers (Zurich controls when claims are paid subject only to the ability of the claimants to individually secure judgments). Zurich has consistently refused to offer settlement amounts (a) before the courthouse steps, and (b) in an amount remotely reflecting the expected jury verdicts.

36.    Further, Zurich has exploited the Stickiness characteristic of its Commodity Profit from claim reserves for claims of Libby Asbestos Claimants by

deliberately Leveraging Hutt, whose lead case controls the litigation bottleneck. Unlike a loan, futures contract, or stock arbitrage, this investment capital source is Sticky because the investment entity is not subject to a loan default or "strike" price; rather, the payment obligation on the bundled claims comes due on discrete individual claim basis and the individual claims are litigated behind the Hutt lead case.

37.     At an average annual rate of return in excess of 11%, Zurich has earned hundreds of millions of dollars on the Libby asbestos claim reserves for fully accrued clear liability claims over the past 20 years of litigation by Opportunistically Breaching its Claim Settlement Duties to all Libby Asbestos Claimants through a Lead Case Strategy directed at Plaintiff Hutt's insurance claim.

38.     Even if Zurich were to pay the claims of Hutt and all other Libby Asbestos Claimants in the amounts of their verdicts and judgments, the delay nets Zurich more in profit than it will pay – it still comes out ahead through its Opportunistic Breach and treatment of the claims as a source of capital for Commodity Profit. Equity must intervene in these circumstances of deliberated intentional wrong and Opportunistic Breach because compensatory damages are not the appropriate measure of Zurich's illicit profits, and because the object of the controlling equitable principle is to eliminate the profit from wrongful conduct.

## CLAIM 2
### (Claim for Damages and Punitive Assessment for Zurich's Breach of Duties to Attempt Good Faith Settlement)

39.    All preceding allegations are hereby incorporated in this claim.

40.    The value of Hutt's Clear Liability Claim against MCC has been adjudicated to be $36.5 million.

41.    At no time has Zurich made an insurance claim settlement offer remotely reflecting the value of Hutt's claim against MCC.

42.    Liability on Hutt's claim against MCC is and has always been reasonably clear if not adjudicated. First, the duty to warn was clearly owed for MCC's undertaking to provide the Safety Program and associated safety services; second, the failure to warn is clear from the complete absence of any factual basis for MCC to contend any warning had been given of the asbestos hazard combined with "overwhelming" evidence of MCC's strategic concealment of the asbestos hazard; third, causation of Hutt's asbestos disease (under the substantial contribution standard) is unquestionable because Hutt's asbestos disease is specific to asbestos exposure, his exposures were not merely substantial but extreme, and there was no evidence of other significant asbestos exposures.

43.    Zurich has withheld and delayed settlement offers (a) with an intent to take advantage of each Plaintiff Hutt's disadvantaged position during the settlement negotiations, (b) with intent and knowledge of the Leveraging effect of its conduct,

(c) in conscious disregard of the known and intended injury to and Leveraging of Plaintiff and other Libby Asbestos Claimants, (d) with intent that the exploitation effect would decrease and delay its liability exposure with respect to the Hutt claim and the claims of similarly situated Libby Asbestos Claimants, (e) with intent to favorably position Zurich to buy off Hutt's claim before it established Zurich's claim preclusion liability to other Libby Asbestos Claimants; (f) with intent to eliminate accountability for its bad faith conduct by requiring Hutt to release his bad faith claim in order to secure a settlement of his insurance claim, and (g) with intent to use the claim settlement treatment of Hutt's lead case to influence the settlement value of cases following Hutt's lead case, enabling Zurich to buy off other Libby Asbestos Claimants' claims and thus continue Zurich's Commodity Profit scheme.

44.    Zurich has withheld and delayed settlement offers upon Zurich's recognition that (a) a failure to timely settle  the claim in Hutt's lead case would delay the need to pay settlement amounts to other Libby Asbestos Claimants, (b) a failure to timely settle Hutt's lead case and withholding of advance medical bill payment would influence the settlement value of cases following Hutt's lead case, enabling Zurich to buy off other Libby Asbestos Claimants' claims, (c) a failure to timely settle Hutt's lead case would favorably position Zurich to buy off Hutt's claim before it established Zurich's claim preclusion liability to other Libby Asbestos Claimants, and (d) requiring Hutt to release his bad faith claim in order to secure a

settlement of his insurance claim would eliminate accountability for Zurich's bad faith conduct.

45.    Zurich's withholding and delaying of settlement offers constitute breach of the statutory settlement duties under Section 33-18-201, MCA.

46.    Zurich's withholding and delaying of settlement offers constitute breach of the common law duties of good faith owed to third party claimants.

47.    Zurich's withholding and delaying of settlement offers is an evasion of the protection purpose of insurance so that Zurich can collect Commodity Profit, where the money owed to Hutt and similarly situated Libby Asbestos Claimants on their fully accrued, clear liability claims is the source of investment capital. Because Hutt and similarly situated Libby Asbestos Claimants require the settlement money to pay for medical expenses, to otherwise address the harm arising from their asbestos injuries, and to secure a just resolution within their lifetimes, Zurich's Commodity Profit scheme literally makes profit a function of human suffering.

48.    As a result of Zurich's failure to attempt settlement, Hutt incurred the expense of unnecessary litigation and suffered personal damages, including:

1.    inability to secure needed medical and disability related care equipment and services;

2.    impairment of end-of-life decisions; and

3.    worry, anguish, disappointment, grief, anger, and outrage.

49.     Zurich's conduct was malicious such that punitive damages should be assessed in an amount sufficient to punish and make example of the Zurich's conduct, and, further, remove the profitability of Zurich's delay and treatment of Hutt's insurance claim.

50.     Zurich's withholding and delaying of settlement offers has occurred over the periods described in the following Counts of this claim.

<u>COUNT I</u>

51.     During the period from the October 21, 2014, presentation of Hutt's claim against MCC, to the October 17, 2016, Order of the Bankruptcy Court in case 14-50867-KJC, all of the undisputed facts and incontrovertible admissions in MCC's own words and own documents – the exclusive evidence of MCC's knowledge and conduct - were known to Zurich to be the controlling proof in the analysis of MCC's liability for its conduct when the workers' compensation insurer for W.R. Grace.

52.     Zurich made **no settlement offers** to resolve Plaintiff Hutt's insurance claim between October 21, 2014, and October 17, 2016.

53.     The contention that MCC was entitled to the protection of a Bankruptcy Plan insurance policy channeling injunction was adjudicated to be a meritless because MCC's workers compensation policies were not included in the injunction and the contention was not a reasonable basis for contesting Hutt's claim.

COUNT II

54.    During the period from October 17, 2016, to the January 13, 2019, Summary Judgment ruling of the Asbestos Claims Court, the always known and undisputed facts and incontrovertible admissions in MCC's own words and own documents – the exclusive evidence of MCC's knowledge and conduct -were acknowledged and admitted to by the Rule 30(b)(6) testimony of MCC's corporate witnesses in 2018 depositions.

55.    Zurich's only settlement offer to resolve Plaintiff Hutt's insurance claim between from October 17, 2016 to the January 13, 2019 was **$30,000.**

COUNT III

56.    On January 13, 2019, the Asbestos Claims Court issued a Summary Judgment Ruling including the following conclusions were established as a matter of law:

> [T]he moral blame attached to MCC's conduct is significant. **MCC had actual knowledge that not only workers, but community members, were being exposed to a hidden asbestos hazard** that was causing significant injury.... **MCC knew** the failure to control the dust or warn of the hazards of exposure **would continue to increase the risk of harm to workers**, as it acknowledged the duration of exposure was a significant aspect of the risk of harm to workers. ...[T]he consequence to the community of not imposing a duty to warn under these circumstances is great, and **the failure to warn has clearly resulted in catastrophic consequences to workers and the community** at large."

57.    Following the January 13, 2019, Summary Judgment ruling of the Asbestos Claims Court through the March 25, 2020, ruling of the Montana Supreme Court, Zurich made no offers to settle Plaintiff Hutt's insurance claim.

<u>COUNT IV</u>

58.    On March 25, 2020, the Montana Supreme Court issued a unanimous opinion affirming the Summary Judgment conclusion that MCC owed a duty to warn Hutt. A majority of the court explained as follows:

> Beyond merely undertaking industrial hygiene services and implementing a Safety Plan, the record establishes extensive communication between MCC and Grace revealing affirmative efforts by MCC to conceal early signs of asbestosis and other lung disease in Grace and Zonolite workers. Grace and MCC worked together to transfer ill employees to areas with reduced concentrations of asbestos dust **in order to avoid insurance liability**. MCC was not merely negligent in its failure to act; rather, in strategically recognizing the latency period for asbestosis to develop, MCC engaged **in affirmative actions to conceal** the asbestos exposure risk and worker injuries to avoid liability, effectively **increasing the risk of additional harm to Mill workers** from further asbestos exposure.

59.    Zurich made no offer to settle the insurance claim following the March 25, 2020, the Montana Supreme Court ruling until August 12, 2021, when it offered a conditioned settlement offer of $500,000.

60.    Zurich's offer of $500,000 was conditioned on Hutt also releasing claims against Zurich for its breach of claim settlement duties, and Zurich made no

offer in response to Hutt's request for an on offer to settle the insurance claim without the condition of release of claims for violation of claim settlement duties.

61.    Zurich made no further offers or attempts to settle until trial began on February 7, 2022.

## COUNT V

62.    During the trial, Zurich made an offer of $950,000, and failed to respond to Hutt counsel's request for a reasonable compromise settlement offer "in the range of $7 million."

63.    MCC presented no witnesses at trial other than a corporate representative who attempted (a) to recant his 30(b)(6) admissions, and (b) to falsely state the law, requiring a corrective instruction from the court.

64.    In a further attempt to buy off Hutt before his case established Zurich's claim preclusion liability to other Libby Asbestos Claimants, Zurich offered $2.5 million hours before the jury returned a verdict of $36.5 million. Zurich's $2.5 million offer was withdrawn as the jury was directed by the Court to deliberate, and no further offers were made by Zurich.

## COUNT VI

65.    Following the $36.5 million jury verdict entered on February 17, 2022, through the November 16, 2022, Order of the Court affirming the Jury's punitive damage assessment, Zurich made no offers to attempt to settle Hutt's insurance

claim. Instead, Zurich made the unilateral decision to make what it called a "voluntary payment" of "Mr. Hutt's past medical expenses and the value of the life care plan presented into evidence at Mr. Hutt's recent trial: a total voluntary payment of $415,561.00." Thereafter, Zurich made no further payments or offers of any kind before a mediation on December 14-15, 2022.

66.    On November 16, 2022, the court issued an order reviewing the evidence in support of the punitive damage assessment which order concluded:

> The **trial evidence overwhelmingly proved** that MCC deliberately and systematically acted to prevent workers from learning about the empirically proven health risks they faced from mining vermiculite in the Libby mill operated by W.R. Grace. Substantial credible evidence proved **MCC knew of and actively urged W.R. Grace to conceal reports** outlining the risk in general terms. Further, MCC **knew of and worked to conceal known risks to specific individual workers who had been diagnosed with asbestos-related disease, including Ralph Hutt**.

67.    Until a confidential mediation was conducted beginning December 14, 2022, Zurich made no further settlement offers to Hutt following its last (withdrawn) offer at trial, and its last (withdrawn) offer was less than 7 percent of the adjudicated value of Hutt's Clear Liability Claim.

## CLAIM 3
### (Claim for Damages and Punitive Assessment for Zurich's Breach of Duties to Advance Medical Expenses)

68.    All preceding allegations are hereby incorporated in this claim.

69.     MCC's liability on Hutt's claim is and always has been reasonably clear for the reasons described above. Zurich owed a duty to make advance payments of Hutt's asbestos disease-related medical expenses under the requirements of Section 33-18-201, MCA, and Zurich's common law duties of good faith.

70.     Despite multiple requests for advance payment of medical expense of Hutt's asbestos disease, Zurich made no advance payment or offer of advance payment at any time before the February 17, 2022, verdict.

71.     Zurich withheld advance payment of medical expenses (a) with an intent to take advantage of each Plaintiff Hutt's disadvantaged position during the settlement negotiations, (b) with intent and knowledge of the Leveraging  and exploiting Hutt's need for medical care, physical disability, economic difficulties and fear of no remedy in his lifetime, (c) in conscious disregard of the known and intended injury to and Leveraging of Hutt, (d) with intent that the exploitation effect would decrease and delay its liability exposure with respect to the Hutt claim and the claims of similarly situated Libby Asbestos Claimants, (e) with intent to favorably position Zurich to buy off Hutt's claim before it established Zurich's claim preclusion liability to other Libby Asbestos Claimants, and (f) with intent to use the claim settlement treatment of Hutt's lead case to influence the settlement value of cases following Hutt's lead case.

72.    Zurich withheld advance payment of medical expenses upon Zurich's recognition that (a) withholding of advance medical bill payment would influence the settlement value of Hutt's case, (b) would enhance Zurich's opportunity to buy off Hutt's claim before it established Zurich's claim preclusion liability to other Libby Asbestos Claimants, and (d) requiring Hutt to release his bad faith claim in order to secure a settlement of his insurance claim would eliminate accountability for Zurich's bad faith conduct.

73.    As a result of Zurich's failure to advance medical expenses, Hutt incurred the expense of unnecessary litigation and suffered personal damages, including:

1.    inability to secure needed medical and disability related care equipment and services;

2.    impairment of end-of-life decisions; and

3.    worry, anguish, disappointment, grief, anger, and outrage.

74.    Zurich's conduct was malicious such that punitive damages should be assessed in an amount sufficient to punish and make example of the Zurich's conduct, and, further, remove the profitability of Zurich's delay and treatment of Hutt's insurance claim.

## CLAIM 4
### (Leveraging of Unfair Claim Settlement Practices Claim)

75.    All preceding allegations are hereby incorporated in this claim.

76.    In addition to his claim against MCC for his asbestos disease injury, Plaintiff Hutt had a claim against Zurich for its bad faith and unfair insurance claim handling conduct. The latter claim is wholly separate from the liability of MCC which Zurich insured.

77.    MCC's liability on Hutt's personal injury claim is and always has been reasonably clear for the reasons described above. Zurich owed a duty to make settlement offers not conditioned on release of Hutt's claim for breach of claim settlement duties under the requirements of Section 33-18-201, MCA, and Zurich's common law duties of good faith.

78.    Conditioning settlement of an insurance claim on the release of liability for claim settlement practices is a form of bad faith and improper leveraging recognized to be improper by uniformly consistent caselaw, insurance industry practice, and the Montana Defense Trial Lawyers Release Deskbook because an insurer wishing to be discharged of liability for its claim must "separately negotiate that claim" or be subject to "additional liability."

79.    Conditioning settlement of an insurance claim on the release of liability for claim settlement practices is an especially insidious form of bad faith and improper leveraging because it is exculpatory of tortious conduct, which exculpation will incent and allow bad faith insurance claims practices without accountability.

80.    Despite multiple requests for settlement offers not conditioned on release of Hutt's claim for breach of claim settlement duties, Zurich made no such offers before the December 14-15, 2022, mediation.

81.    Zurich failed and refused to make settlement offers not conditioned on release of Hutt's claim for breach of claim settlement duties (a) with an intent to take advantage of each Plaintiff Hutt's disadvantaged position during the settlement negotiations, (b) with intent and knowledge of the Leveraging and exploiting Hutt's need for medical care, physical disability, economic difficulties and fear of no remedy in his lifetime, (c) in conscious disregard of the known and intended injury to and Leveraging of Hutt, and (d) with intent that the exploitation effect would decrease and delay its liability exposure with respect to the Hutt claim and the claims of similarly situated Libby Asbestos Claimants.

82.    Zurich failed and refused to make settlement offers not conditioned on release of Hutt's claim for breach of claim settlement duties upon Zurich's recognition that the improper condition (a) would eliminate accountability for Zurich's bad faith conduct to Hutt, and (b) would enable Zurich to apply the same Leveraging pressure to all other similarly situated Libby Asbestos Claimants, and (c) would enhance Zurich's ability to successfully continue its Commodity Profit strategy for all the insured liability to Libby Asbestos Claimants without accountability for its bad faith conduct.

83.    As a result of Zurich's failure and refusal to make offers on Hutt's insured personal injury claim, Hutt forced to litigate his personal injury claim, incur the expense of unnecessary litigation and suffered personal damages, including:

    1.    inability to secure needed medical and disability related care equipment and services;

    2.    impairment of end-of-life decisions; and

    3.    worry, anguish, disappointment, grief, anger, and outrage.

84.    Zurich's conduct was malicious such that punitive damages should be assessed in an amount sufficient to punish and make example of the Zurich's conduct, and, further, remove the profitability of Zurich's delay and treatment of Hutt's insurance claim.

WHEREFORE PLAINTIFF PRAYS FOR THE FOLLOWING RELIEF:

1.    An award of Damages for:

    a. injury resulting from delay in asbestosis-related medical care services or items Ralph Hutt was unable to afford;

    b. financial and economic consequences of delayed or denied settlement amounts or advance payments, including lost time value of money, economic insecurity;

    c.  general damages for opportunities to live and enjoy life that were lost by reason of the of delayed or denied settlement amounts or advance payments;

    d.  general damages for losses including pain, suffering, emotional distress, anger, fear, outrage, and disappointment.

    e.  general damages for losses sustained by reason of impairment of end-of-life decisions;

    f.  interest on the above amounts and recovery of the lost time value of delayed payments;

2.    An assessment of punitive damages in an amount sufficient to punish and make example of the Zurich's conduct, and, further, remove the profitability of Zurich's delay and treatment of Hutt's insurance claim.

3.    Equitable remedy addressing Zurich's unjust enrichment with profits generated through breach of duties to Hutt on delayed payment of the insurance claims of Hutt and similarly situated Libby Asbestos Claimants, including disgorgement of profits earned by reason of Zurich's breach of duties to Hutt.

4.    Such other and further legal and equitable relief as is just.

DATED this 4th day of January, 2023.

                            */s/ A. Clifford Edwards*
                            A. Clifford Edwards
                            EDWARDS & CULVER
                            Attorneys for Plaintiff Ralph Hutt